R.T. VANDERBILT COMPANY, INC. *v.* CONTINENTAL CASUALTY COMPANY ET AL.
(SC 17178)

Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js.

Argued November 22, 2004—officially released April 26, 2005

*Francis J. Brady,* with whom were *Marilyn B. Fagelson* and, on the brief, *David L. Elkind,* pro hac vice, for the appellant (plaintiff).

*Joel M. Fain,* with whom were *Trenton C. Haas* and *Charles A. Booth,* pro hac vice, for the appellee (named defendant).

*Opinion*

SULLIVAN, C. J. The plaintiff, R.T. Vanderbilt Company, Inc., appeals from the judgment of the trial court rendering summary judgment in favor of the named defendant,[1] Continental Casualty Company. The plaintiff's sole claim on appeal is that the trial court improperly held that a potentially responsible party (PRP) letter, issued by the United States Environmental Protection Agency (EPA) pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et seq., and the Resource Conservation and Recovery Act, 42 U.S.C. § 6973, does not constitute a "suit" within the meaning of a comprehensive general liability insurance policy and therefore does not trigger the insurer's duty to

---

[1] The second amended complaint, which is the relevant complaint for the purpose of this appeal, asserted various claims against two defendants, the named defendant and Hartford Accident and Indemnity Company (Hartford). Ultimately, the plaintiff withdrew all claims against Hartford and, accordingly, Hartford is not a party to this appeal. All subsequent references to the defendant are to Continental Casualty Company.

defend. We agree and, accordingly, reverse the judgment of the trial court.

The record reveals the following facts and procedural history. The plaintiff owns a chemical manufacturing facility in Bethel and disposed of industrial wastes produced at that facility at the Solvents Recovery Service of New England (Solvents Recovery Service) site and at the Old Southington Landfill site, both located in Southington.[2] On June 11, 1992, the plaintiff received a letter from the EPA explaining that it was a PRP for environmental contamination at the Solvents Recovery Service site[3] under §§ 106 (a) and 107 (a) of CERCLA, 42 U.S.C. §§ 9606 (a) and 9607 (a), and under § 7003 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6973. On January 21, 1994, the plaintiff received a similar letter from the EPA explaining that it was also a PRP for environmental contamination at the Old Southington Landfill site[4] pursuant to the same statutory provisions. These PRP letters informed the plaintiff that the EPA had "documented the release and threatened release of hazardous substances, pollutants and

---

[2] The plaintiff also disposed of industrial wastes at the Gallup's Quarry site in Plainfield and the Davis Liquid Waste site in Smithfield, Rhode Island. Neither site is involved in this appeal.

[3] Solvents Recovery Service handled and processed used solvents from a variety of industrial and commercial clients. The EPA notified approximately 1300 entities of their "potential responsibility for the site contamination resulting from having sent spent solvents to [Solvents Recovery Service] for processing."

[4] The plaintiff sent industrial waste, generated from its Bethel facility, to the Solvents Recovery Service site for processing, which in turn sent the waste to the Old Southington Landfill site for disposal. From 1955 until 1967, when the Old Southington Landfill closed, Solvents Recovery Service sent waste to the Old Southington Landfill for disposal. The EPA deemed all of Solvents Recovery Services' known customers during that time period to be PRPs at the Old Southington Landfill site. The plaintiff did not send waste to Solvents Recovery Service until 1965. Accordingly, the plaintiff's status as a PRP for the Old Southington Landfill site stems from its shipments of waste to Solvents Recovery Service during the two year period from 1965 until 1967.

contaminants" at the Solvents Recovery Service and the Old Southington Landfill sites and had already spent a significant amount of money on response actions.[5] They further "requested" the plaintiff's "voluntary" participation in undertaking cleanup activities at these sites and demanded payment for past and future response costs, plus interest.[6] Each PRP letter was marked "URGENT LEGAL MATTER—PROMPT REPLY NECESSARY" and the EPA requested a response to each letter within thirty days.[7] Each PRP letter further notified the plaintiff that "[t]he factual and legal discussions

[5] The PRP letters reported that the EPA had already spent approximately $3.35 million on response actions at the Solvents Recovery Service site and approximately $1,860,110.46 on response actions at the Old Southington Landfill site. With respect to the Old Southington Landfill site, however, the EPA was seeking only $1,344,071.58 in past response costs because it had already been reimbursed for $516,038.88.

[6] The Solvents Recovery Service PRP letter informed the plaintiff that the "following studies and activities [were] necessary at the [s]ite:

"1. [C]ontinuation of a [r]emedial [i]nvestigation to define the nature and extent of soil, air, surface water and ground water contamination at the [s]ite and to evaluate the risks they pose to human health and the environment;

"2. initiation of a [f]easability [s]tudy to evaluate the feasibility of possible remedial actions to remove, treat or contain the hazardous substances, pollutants, and contaminants at the [s]ite that pose risks to human health and the environment;

"3. the design and implementation of the remedial action selected by EPA for the [s]ite; and

"4. operation, maintenance and monitoring as necessary at the [s]ite."

The Old Southington Landfill PRP letter informed the plaintiff that the "EPA is planning to conduct the following activities at the [s]ite:

"1. Design and implementation of the remedial action selected and approved by EPA for the [s]ite;

"2. [o]peration, maintenance and monitoring necessary at the [s]ite." Both letters further provided that "[i]n addition to those activities enumerated above, EPA may, pursuant to its authorities under CERCLA and other laws, decide that other cleanup activities are necessary to protect public health, welfare or the environment."

[7] The Old Southington Landfill PRP letter reported that if the EPA did not receive a response within thirty days it would "assume that [the plaintiff did] not wish to negotiate a resolution of [its] liability in connection with the [s]ite and that [it had] declined any involvement in performing the response activities."

in this letter are intended solely to provide notice and information, and such discussions are not to be construed as a final agency position on any matter set forth herein."

The defendant had issued various comprehensive general liability insurance policies to the plaintiff for the time period between January 1, 1965, and March 3, 1977.[8] At issue in this appeal are two policies: (1) a policy spanning the time period from January 1, 1965, until January 1, 1968 (1965 policy); and (2) a policy spanning the time period from January 1, 1968, until January 1, 1971 (1968 policy). The 1965 policy provides in relevant part: "With respect to such insurance as is afforded by this policy, the company shall: (a) defend any *suit* against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such *suit* is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or *suit* as it deems expedient . . . ." (Emphasis added.) The 1968 policy provides in relevant part: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of A. bodily injury or B. property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any *suit* against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the *suit* are groundless, false or fraudulent, and may make such investigation and settlement of any claim or *suit* as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any *suit* after the applicable limit of the company's liability has been

---

[8] In its brief, the plaintiff notes that its complaint "allege[d] that [the defendant] sold it insurance policies prior to 1965, which [the defendant] disputes. Resolution of that issue is not germane to this appeal."

exhausted by payment of judgments or settlements." (Emphasis added.) The term suit is not defined in either policy.

The plaintiff notified the defendant that it had received the PRP letters and requested defense and indemnification under the relevant policies. The defendant responded that "although it appears there is no coverage . . . for several reasons . . . [we] will contribute to [the plaintiff's] defense of those two matters, pursuant to a complete reservation of all rights" because the losses at the Solvents Recovery Service and the Old Southington Landfill sites "may at least potentially implicate certain years of coverage . . . ." Thereafter, the defendant ceased communications with the plaintiff concerning its alleged entitlement to indemnification and defense costs.

The plaintiff thereafter filed the present action seeking, inter alia, a judgment declaring the defendant's obligation to defend the plaintiff and damages for the defendant's breach of its contractual duty to defend the plaintiff in the Solvents Recovery Service and the Old Southington Landfill administrative actions pursuant to multiple comprehensive general liability insurance policies issued by the defendant to the plaintiff between January 1, 1965, and March 3, 1977.[9] Subsequently, the plaintiff filed a motion for partial summary judgment and the defendant filed a cross motion for summary

---

[9] The complaint sought recovery under several comprehensive general liability insurance policies and excess umbrella liability insurance policies. In addition to the counts seeking damages and declaratory relief for defense costs, the plaintiff also sought damages for the defendant's alleged breach of its duty to indemnify the plaintiff and a judgment declaring that the defendant had a duty to pay the plaintiff's liability in the Solvents Recovery Service and the Old Southington Landfill administrative actions. The plaintiff also sought a declaratory judgment and contractual damages with respect to the defendant's duty to defend and indemnify the plaintiff in administrative proceedings concerning the Davis Liquid Waste site.

judgment concerning the defendant's duty to defend the plaintiff under the 1965 and 1968 policies.[10]

The trial court rendered summary judgment in favor of the defendant. In its memorandum of decision, the trial court concluded that the defendant had no duty to defend the plaintiff in the Solvents Recovery Service and in the Old Southington Landfill administrative actions because a PRP letter issued by the EPA is not a suit as that term is used in the 1965 and 1968 comprehensive general liability policies. Specifically, the trial court held that: (1) "the term 'suit' denotes court proceedings"; (2) "limiting the term 'suit' to proceedings involving a court complaint makes it possible to apply the rule that the duty to defend is 'measured by the allegations in the complaint' "; (3) "employing a bright line definition of 'suit' limited to court proceedings is practical and reasonable"; and (4) "[i]nterpreting 'suit' to mean a proceeding filed in court helps preserve a distinction between the terms 'claim' and 'suit' used in these policies." Thereafter, the plaintiff withdrew all remaining counts of the complaint unrelated to the defendant's duty to defend, the trial court rendered judgment in favor of the defendant and the plaintiff appealed.[11]

As a preliminary matter, we set forth the appropriate standard of review. "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in

[10] The plaintiff first moved for partial summary judgment on July 7, 1998, and the defendant first filed its cross motion for summary judgment on November 12, 1998. On August 16, 2002, the trial court denied both motions for reasons discussed later in this opinion. Thereafter, on October 3, 2002, the plaintiff renewed its motion for partial summary judgment and the defendant again filed a cross motion for summary judgment. The trial court's ruling on these later renewed motions is at issue in this appeal.

[11] The plaintiff appealed from the judgment of the trial court to the Appellate Court and we granted the plaintiff's motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law." (Internal quotation marks omitted.) *Allstate Ins. Co.* v. *Barron*, 269 Conn. 394, 405, 848 A.2d 1165 (2004). "Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) Id., 406. Moreover, "[c]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo." (Internal quotation marks omitted.) *Galgano* v. *Metropolitan Property & Casualty Ins. Co.*, 267 Conn. 512, 519, 838 A.2d 993 (2004).

The plaintiff argues that the term suit in the 1965 and 1968 comprehensive general liability insurance policies is ambiguous because it has two general meanings: (1) " 'an action to secure justice in a court of law' "; or (2) " 'an attempt to recover a right or claim through legal action.' " The plaintiff argues that because, under Connecticut law, ambiguity in the language of an insurance policy is construed in favor of coverage, and because the second definition of the term suit is broad enough to encompass an EPA administrative action initiated by a PRP letter, we must construe the ambiguity in the language of the policy in favor of the defendant's duty to defend. The defendant counters that the term suit is unambiguous, that its natural and ordinary meaning is limited to "an action filed in a court of law," and, accordingly, that the defendant has no duty to defend. We agree with the plaintiff.

To provide context for our analysis of the plaintiff's claim, we begin with a brief overview of relevant CERCLA provisions. CERCLA was enacted in 1980 and provides the federal government with "a mechanism for cleanup of existing hazardous waste sites, and it does

so essentially by permitting the government either to order a responsible party to clean up the polluted site or to clean up a site itself and obtain reimbursement from the responsible party. It also makes the responsible party liable for damages to the environment and for costs such as litigation expenses and attorney fees."[12] 21 E. Holmes, Appleman on Insurance 2d (2002) § 132.6 [4], p. 116.

CERCLA imposes strict liability and joint and several liability upon responsible entities. See id. Additionally, because CERCLA liability is retroactive; see id.; a responsible entity can be held liable, without regard to fault, for the entire cleanup of a hazardous waste site or for the entire cost of remediation. See Office of Solid Waste and Emergency Response Directive No. 9832.1, EPA Memorandum on Cost Recovery Actions Under the Comprehensive Environmental Response, Compensation, and Liability Act (August 26, 1983), 21 Environment Rptr. (BNA), Federal Laws, pp. 5531, 5535. There are only three possible defenses to CERCLA liability: that the pollution was caused by (1) an act of God; (2) an act of war; or (3) an act or omission of a third party who is not an employee of the responsible entity and who does not have a contractual relationship with a responsible entity. See 42 U.S.C. § 9607 (b).

"A fundamental goal of the CERCLA enforcement program is to facilitate voluntary settlements." Interim Guidance on Notice Letters, Negotiations, and Information Exchange, 53 Fed. Reg. 5298 (February 23, 1988). Accordingly, the EPA usually first contacts a suspected polluting entity with a PRP letter[13] to "inform PRPs of

---

[12] Under CERCLA, "[t]he broad spectrum of responsible parties can include hazardous waste generators and transporters, and owners and operators of the facility at which the waste is located." 21 E. Holmes, Appleman on Insurance 2d (2002) § 132.6 [4], p. 116; see also 42 U.S.C. § 9607 (a).

[13] EPA guidelines provide that "[t]he general notice letter should be sent to PRPs as early in the process as possible . . . . Early receipt of the general notice will ensure that PRPs have adequate knowledge of their potential liability as well as a realistic opportunity to participate in settlement

their potential liability for future response costs, to begin or continue the process of information exchange, and to initiate the process of 'informal' negotiations." Id., 5300. EPA guidelines provide that PRP letters "should be sent to all parties where there is sufficient evidence to make a preliminary determination of potential liability under [42 U.S.C. § 9607]." Id., 5301; see also 42 U.S.C. § 9613 (k) (2) (D).

"If the PRP chooses not to respond to the initial PRP letter, the EPA will take one of several steps: (1) seek an injunction in Federal District Court forcing the PRP to act; (2) issue an administrative order pursuant to [42 U.S.C. §§ 9604 (e) or 9606 (a)], either demanding information or forcing PRP cleanup; or (3) send additional notice letters, known colloquially as 'drop dead' letters, informing the PRPs that they must follow the EPA's suggested cleanup 'voluntarily,' otherwise, the government will expurgate the pollution itself, and thereafter demand reimbursement through a . . . cost recovery action [pursuant to 42 U.S.C. § 9607]. . . . Whether the EPA attempts to compel cleanup or seeks reimbursement, once the agency notifies a party of its potential liability, the PRP is faced with three alternatives: (1) engage in a voluntary settlement; (2) force the government to order cleanup; or (3) have the government unilaterally implement cleanup and litigate for reimbursement later." Annot., 48 A.L.R.5th 355, 367 (1997).

"A good percentage of [CERCLA] matters are resolved through a negotiated settlement process that results in a consent decree." C. Switzer & L. Bulan, CERCLA: Comprehensive Environmental Response, Compensation, and Liability Act (Superfund) (2002)

negotiations." Interim Guidance on Notice Letters, Negotiations, and Information Exchange, supra, 53 Fed. Reg. 5301. The PRP letter becomes a part of the administrative record. Id., 5302.

§ 11.1.4, p. 77. The possible benefits of voluntary settlement may include any or all of the following: (1) immunity from contribution actions brought by nonsettling parties;[14] (2) concessions with respect to past environmental cleanup costs;[15] (3) lower remediation costs;[16] (4) alternative and less costly remediation methods; (5) control over the administrative record;[17] and (6) a covenant not to sue.[18] See id., pp. 77–78.

If a PRP declines to settle with the EPA, the EPA can issue an administrative order compelling the PRP to clean up the hazardous waste site. See 42 U.S.C. § 9606 (a). A PRP's failure to comply with an administrative order, without sufficient cause, can result in "an action brought in the appropriate United States district court to enforce such order" and a fine of "not more than $25,000 for each day in which such violation occurs

---

[14] Section 9613 (f) (2) of title 42 of the United States Code provides that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement." This statutory protection is "a significant inducement for most settlements." C. Switzer & L. Bulan, supra, § 11.1.4, p. 77.

[15] "The government often is willing to make concessions with regard to past costs since the settling party is assuming the liability for the present/future cleanup costs, especially where there are solvent parties who refuse to settle and the government will allocate a large chunk of its past costs to the nonsettling parties." C. Switzer & L. Bulan, supra, § 11.1.4, p. 77.

[16] "Often the parties believe that they can perform the cleanup work at a lower cost than the government. This may be the case, as government work must go through the public bidding process that many people believe drives up the cost of the remedial work." C. Switzer & L. Bulan, supra, § 11.1.4, p. 77.

[17] "Those parties that are performing the remediation work have a degree of control over the administrative record, which can be exceedingly useful in disputes with the government over the selection of a remedy or in a contribution fight with nonsettling parties." C. Switzer & L. Bulan, supra, § 11.1.4, p. 78.

[18] See 42 U.S.C. § 9622 (f) (1).

or such failure to comply continues." 42 U.S.C. § 9606 (b) (1). Judicial review of the administrative order is limited to the administrative record and an appeal will only be successful if the response action "was arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. §§ 9606 (b) (2) (D) and 9613 (j) (2).

Alternatively, if a PRP declines to settle with the EPA, the EPA can clean up the hazardous waste site itself and pursue a cost recovery action against the PRP.[19] See 42 U.S.C. § 9607 (a). Moreover, to ensure reimbursement for cleanup costs, the government can place a federal lien on a PRP's property and property affected by the government's removal or remedial action.[20] See 42 U.S.C. § 9607 (*l*). Judicial review of the EPA's choice of remedy and its cost is limited to the administrative record and an appeal will only be successful if the PRP can demonstrate that the EPA's decision "was arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. § 9613 (j) (2).

---

[19] Under § 9607 (a) (4) of title 42 of the United States Code, PRPs are jointly and severally responsible for "(A) all costs of removal or remedial action incurred by the United States [g]overnment . . .

"(B) any other necessary costs of response incurred by any other person . . .

"(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such release; and

"(D) the costs of any health assessment or health effects study carried out . . . ."

The EPA can also recover the interest on all costs incurred. See 42 U.S.C. § 9607 (a).

[20] Section 9607 (*l*) (2) of title 42 of the United States Code provides that the lien arises at the later of the following: "(A) The time costs are first incurred by the United States with respect to a response action . . . [or]

"(B) The time that the [PRP] . . . is provided (by certified or registered mail) written notice of potential liability [i.e., PRP letter]." The lien "shall continue until the liability for the costs (or a judgment against the person arising out of such liability) is satisfied or becomes unenforceable through operation of the statute of limitations . . . ." 42 U.S.C. § 9607 (*l*) (2) (B). The only type of PRP exempted from CERCLA's federal lien provisions are "owner[s] or operator[s] of a vessel . . . ." 42 U.S.C. § 9607 (*l*) (1).

Although the issue of whether a PRP letter constitutes a suit within the meaning of a comprehensive general liability insurance policy is one of first impression in Connecticut, various state and federal courts have addressed the question and have arrived at differing results. See generally 1 B. Ostrager & T. Newman, Insurance Coverage Disputes (12th Ed. 2004) § 10.04 [c], pp. 700–15; 20 E. Holmes, supra, § 129.2 H, pp. 91–103. The courts of Colorado, Iowa, Massachusetts, Michigan, Minnesota, New Hampshire, North Carolina and Wisconsin have all held that a PRP letter, or its state equivalent, constitutes a suit triggering an insurer's duty to defend.[21] These courts have reasoned that the term suit is ambiguous and that, because "CERCLA has given the EPA and governmental agencies statutory power to hold PRPs liable for substantial and significant cleanup costs"; 20 E. Holmes, supra, § 129.2, p. 97; a PRP letter constitutes a suit. The courts of California, Illinois and Maine, however, have held that a PRP letter, or its state equivalent, is not a suit and does not trigger an insurer's duty to defend.[22] These courts have reasoned that "the

[21] See *Compass Ins. Co.* v. *Littleton*, 984 P.2d 606, 622 (Colo. 1999) (en banc) (reh. denied August 9, 1999); *A.Y. McDonald Industries, Inc.* v. *Ins. Co. of North America*, 475 N.W.2d 607, 626–29 (Iowa 1991); *Hazen Paper Co.* v. *United States Fidelity & Guaranty Co.*, 407 Mass. 689, 693–97, 555 N.E.2d 576 (1990); *Michigan Millers Mutual Ins. Co.* v. *Bronson Plating Co.*, 445 Mich. 558, 567–71, 519 N.W.2d 864, reh. denied, 447 Mich. 1202, 530 N.W.2d 745 (1994); *SCSC Corp.* v. *Allied Mutual Ins. Co.*, 536 N.W.2d 305, 315 (Minn. 1995); *Minnesota Mining & Mfg. Co.* v. *Travelers Indemnity Co.*, 457 N.W.2d 175, 182–83 (Minn. 1990); *Coakley* v. *Maine Bonding & Casualty Co.*, 136 N.H. 402, 417–18, 618 A.2d 777 (1992); *C.D. Spangler Construction Co.* v. *Industrial Crankshaft & Engineering Co.*, 326 N.C. 133, 153–55, 388 S.E.2d 557 (1990); *Johnson Controls* v. *Employers Ins. of Wausau*, 264 Wis. 2d 60, 106–14, 665 N.W.2d 257, reconsideration denied, 266 Wis. 2d 68, 671 N.W.2d 853 (2003), cert. denied, 541 U.S. 1027, 124 S. Ct. 2070, 158 L. Ed. 2d 642 (2004); see also *Compass Ins. Co.* v. *Cravens, Darvan & Co.*, 748 P.2d 724, 728–29 (Wyo. 1988) (comprehensive general liability insurance policy covered immediate cleanup costs of oil spill, even though no formal claims were filed).

[22] See *Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.*, 18 Cal. 4th 857, 887–88, 959 P.2d 265, 77 Cal. Rptr. 2d 107 (modified and reh. denied September 23, 1998); *Lapham-Hickey Steel Corp.* v. *Protection Mutual Ins.*

term suit unambiguously refers to an actual court proceeding initiated by the filing of a complaint." (Internal quotation marks omitted.) Id., p. 93. Thus, although "[n]either side of the issue appears to enjoy a clear majority . . . state adjudicators evidently tend towards granting coverage." *Coakley* v. *Maine Bonding & Casualty Co.*, 136 N.H. 402, 409, 618 A.2d 777 (1992). We agree with the majority of the states that a PRP letter is a suit and triggers an insurer's duty to defend.

"Under our law, the terms of an insurance policy are to be construed according to the general rules of contract construction. . . . The determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . However, [w]hen the words of an insurance contract are, without violence, susceptible of two [equally reasonable] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted." (Internal quotation marks omitted.) *Allstate Ins. Co.* v. *Barron*, supra, 269 Conn. 406. "When interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." *O'Brien* v. *United States Fidelity & Guaranty Co.*, 235 Conn. 837, 843, 669 A.2d 1221 (1996).

"It is a basic principle of insurance law that policy language will be construed as laymen would understand

Co., 166 Ill. 2d 520, 529–33, 655 N.E.2d 842 (modified and reh. denied October 2, 1995); *Patrons Oxford Mutual Ins. Co.* v. *Marois*, 573 A.2d 16, 20 (Me. 1990).

it and not according to the interpretation of sophisticated underwriters, and that ambiguities in contract documents are resolved against the party responsible for its drafting; the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." (Internal quotation marks omitted.) Id. "However, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (Internal quotation marks omitted.) *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 584, 573 A.2d 699 (1990).

We are assisted in our interpretation of the term suit by reference to the dictionary. See *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 539, 791 A.2d 489 (2002) ("[t]o ascertain the commonly approved usage of a word, it is appropriate to look to the dictionary definition of the term" [internal quotation marks omitted]). Because the parties entered into the relevant comprehensive general liability policies in the 1960s, we refer to dictionaries from that era. See id. Several definitions of the word suit in those sources include reference to some type of court proceeding. See, e.g., The American Heritage Dictionary of the English Language (1969) ("[a]ny proceeding in court to recover a right or claim"); Random House Dictionary of the English Language (1966) ("the act, the process, or an instance of suing in a court of law; legal prosecution; lawsuit"). Nevertheless, the sources do not define the term suit exclusively as a court proceeding. Several dictionaries also contain a broader definition that includes an "attempt to recover a right or claim through legal action." See Webster's New Twentieth Century Dictionary of the English Language (2d Ed. 1964) ("action to secure justice in a court of law; attempt to recover a right or claim through legal action"); see also

4 Webster's New International Dictionary of the English Language (2d Ed. 1957) ("the following or attending upon a court to obtain justice there; hence, the attempt to gain an end by legal process; an action or process in a court for the recovery of a right or claim; legal application to a court for justice; prosecution of right before any tribunal").

The existence of both a narrow and a broad definition of the term suit imports an ambiguity into the meaning of the term[23] and "persuasively suggests that a typical layperson might reasonably expect the term to apply to legal proceedings other than a court action initiated by a complaint."[24] *Michigan Millers Mutual Ins. Co.* v.

---

[23] We recognize that in *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, supra, 259 Conn. 546, this court cautioned that "[t]he existence of more than one dictionary definition is not the sine qua non of ambiguity. If it were, few words would be unambiguous." (Internal quotation marks omitted.) Yet, the ambiguity in *Buell Industries, Inc.*, is distinguishable from the ambiguity in the present matter. In *Buell Industries, Inc.*, this court interpreted the meaning of a "sudden and accidental" environmental pollution exclusion in comprehensive general liability insurance policies issued by the defendant insurers. Id., 529. We held that although the term "sudden" is defined as both "quick" or "abrupt" and "unexpected," it was not ambiguous as used in the policies because it was juxtaposed with the term "accidental," which connotes unexpectedness. Id., 540–41. Thus, to limit the definition of sudden to unexpected "and therefore . . . a mere restatement of accidental, would render the suddenness requirement mere surplusage." (Internal quotation marks omitted.) Id., 541. Accordingly, we held that the term sudden in the insurance policies unambiguously contained a temporal meaning.

The ambiguity in the present matter differs from *Buell Industries, Inc.*, in two important respects. First, unlike *Buell Industries, Inc.*, we are not presented with two distinct definitions of the term suit. Rather, we are presented with a narrow definition limiting the term to court proceedings and a broader definition extending the term to include any "attempt to recover a right or claim through legal action." Webster's New Twentieth Century Dictionary of the English Language, supra. Second, reading the term suit broadly does not render any other part of the relevant policies mere surplusage. Accordingly, the existence of more than one equally reasonable dictionary definition of the term suit in the 1965 and 1968 comprehensive general liability policies renders the term ambiguous.

[24] The reasonableness of the plaintiff's expectation is bolstered by the fact that the defendant itself initially believed that the PRP letters triggered its duty to defend.

*Bronson Plating Co.*, 445 Mich. 558, 568–69, 519 N.W.2d 864, reh. denied, 447 Mich. 1202, 530 N.W.2d 745 (1994).[25] Because two equally reasonable definitions of the term suit exist, the broad definition must, in preference, be adopted because it will sustain the claim and cover the loss. See *Allstate Ins. Co.* v. *Barron*, supra, 269 Conn. 406; see also *Beach* v. *Middlesex Mutual Assurance Co.*, 205 Conn. 246, 250–51, 532 A.2d 1297 (1987) (concluding that term " 'collapse' " in insurance policy was susceptible to two equally reasonable definitions and adopting definition favoring coverage). Accordingly, we conclude that, because a PRP letter is an "attempt to recover a right or claim through legal action"; see Webster's New Twentieth Century Dictionary of the English Language, supra; under CERCLA's statutory scheme, it constitutes a suit within the meaning of a comprehensive general liability insurance policy.

[25] The defendant argues that *Michigan Millers Mutual Ins. Co.* was overruled by *Wilkie* v. *Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776 (2003). We disagree. In *Wilkie*, the Michigan Supreme Court held that it would no longer recognize the rule of "reasonable expectations" in contract interpretation. See id., 51–63. The court defined the "reasonable expectations" doctrine as an "approach, where judges divine the parties' reasonable expectations and then rewrite the contract accordingly . . . ." Id., 51. The court distinguished, however, between the rule of reasonable expectations and the "well established [rule] that ambiguous language should be construed against the drafter, i.e., the insurer." Id., 62.

In *Michigan Millers Mutual Ins. Co.*, the Michigan Supreme Court did not rely on the reasonable expectations doctrine in determining that a PRP letter constitutes a suit. Instead, it found that the term suit was ambiguous and construed the term against the insurer. See *Michigan Millers Mutual Ins. Co.* v. *Bronson Plating Co.*, supra, 445 Mich. 570–71. *Wilkie* merely cites to the *dissent* in *Michigan Millers Mutual Ins. Co.* as an example of an instance in which the validity of the reasonable expectations doctrine was assumed. See *Wilkie* v. *Auto-Owners Ins. Co.*, supra, 469 Mich. 59, citing *Michigan Millers Mutual Ins. Co.* v. *Bronson Plating Co.*, supra, 594 n.17 (rejecting majority's conclusion that term suit is ambiguous and finding majority's holding unfounded under reasonable expectations doctrine). Thus, we conclude that the Michigan Supreme Court's rejection of the reasonable expectations doctrine in *Wilkie* did not affect its holding in *Michigan Millers Mutual Ins. Co.* that a PRP letter constitutes a suit.

We emphasize that our determination in the present matter is predicated on CERCLA's extremely burdensome provisions and the immediate legal consequences that arise upon the receipt of a PRP letter. Thus, we find that "[t]he consequences of the receipt of the EPA letter [are] so substantially equivalent to the commencement of a lawsuit that a duty to defend [arises] immediately. The EPA letter was not the equivalent of a conventional demand letter based on a personal injury claim." *Hazen Paper Co.* v. *United States Fidelity & Guaranty Co.*, 407 Mass. 689, 696, 555 N.E.2d 576 (1990). "The entire CERCLA scheme revolves around 'encouraging' PRPs to engage in voluntary cleanups. Only in so doing may a PRP have a voice in developing the record that will be used against it and in determining the amount of its liability through selection of investigatory and remedial methods and procedures." *Michigan Millers Mutual Ins. Co.* v. *Bronson Plating Co.*, supra, 445 Mich. 574. Thus, "[t]he situation [is] such that the opportunity to protect [the insured's] interests could well . . . [be] lost, long before any lawsuit [is] brought. It would be naive to characterize the EPA letter as a request for voluntary action. [The insured has] no practical choice other than to respond actively to the letter." *Hazen Paper Co.* v. *United States Fidelity & Guaranty Co.*, supra, 697.[26]

---

[26] Thus, we reject the defendant's assertion that the PRP letters in the present matter merely solicited voluntary cooperation in the cleanup of the Solvents Recovery Service and the Old Southington Landfill sites and were not sufficiently coercive or adversarial to be the functional equivalent of a suit. The issuance of a PRP letter is the first step in an EPA administrative proceeding and has significant legal consequences. As the Supreme Court of Wisconsin explained in *Johnson Controls* v. *Employers Ins. of Wausau*, 264 Wis. 2d 60, 112–13, 665 N.W.2d 257, reconsideration denied, 266 Wis. 2d 68, 671 N.W.2d 853 (2003), cert. denied, 541 U.S. 1027, 124 S. Ct. 2070, 158 L. Ed. 2d 642 (2004): "Because of [its] strong policy in favor of cooperative remediation over litigation, CERCLA provides within its enforcement mechanism significant incentives for prompt and full involvement from all contacted PRPs. Failure to actively engage the EPA following a PRP letter can lead to such adverse consequences as (1) large fines that may include treble punitive damages; (2) an inadequate administrative record affecting the

The defendant argues, however, that the term suit should be limited in meaning to a proceeding in a court of law in order to preserve the distinction between the terms suit and claim in the 1965 and 1968 comprehensive general liability policies. Additionally, the defendant argues that such a narrow definition is necessary to provide insurers with a bright line rule concerning the extent of their duty to defend.[27] We disagree.

insured's interests; (3) use of the insured's non-compliance against the insured in the apportionment of cleanup costs in subsequent litigation; (4) forfeiture of special rights against [later] actions for contribution of response cost payments; and (5) other parties (including perhaps the EPA) cleaning up the site at a higher cost, which will [later] be demanded of the insured."

Moreover, our conclusion that a PRP letter constitutes a suit is consistent with the principles underlying our conclusion in *Alderman* v. *Hanover Ins. Group*, 169 Conn. 603, 363 A.2d 1102 (1975). In *Alderman*, we held that an insured is "entitled to recover expenses incurred in settlement of a claim, where the insurer has wrongfully denied coverage and settlement is made by the insured before any suit has been instituted against the insured by the claimant." Id., 610. In arriving at this conclusion, we quoted the following passage from *American Fire & Casualty Co.* v. *Kaplan*, 183 A.2d 914, 915–16 (D.C. Mun. App. 1962): "We think . . . [the insured's] step in honoring the claim against him cannot be characterized . . . so as to defeat his resultant claim against the insurer. He had an interest of his own to protect. He had both a moral and a legal obligation on which he had been threatened with suit. . . . Under the circumstances, requiring [the insured] to remain passive while suit was filed and judgment taken could serve no useful purpose; it would have been a gesture of futility, and would have fostered unnecessary litigation, with attendant delays and additional expenses." *Alderman* v. *Hanover Ins. Group*, supra, 611. While we agree with the trial court that *Alderman* was decided on "general principles, and did not specifically address whether a prelitigation claim can constitute a 'suit' within the meaning of the policy," we find that the general principles announced in *Alderman* apply to the present matter. Here, as in *Alderman*, we do not think that the recipient of a PRP letter issued by the EPA should be required to "remain passive" in a "gesture of futility" while its legal rights and obligations are almost conclusively determined in an administrative proceeding. See id.

[27] The defendant also argues that public policy concerns support a narrow interpretation of the term suit. We disagree. Various courts and commentators have argued both the possible beneficial and detrimental results of interpreting the term suit in a comprehensive general liability policy to include PRP letters. See, e.g., *Michigan Millers Mutual Ins. Co.* v. *Bronson Plating Co.*, supra, 445 Mich. 575 ("[F]rom a policy perspective . . . the position urged by the defendants [that the term suit is limited to court proceedings] would only increase the litigiousness of this already extensively litigated area of the law. Limiting an insurer's duty to defend to an actual

First, the defendant contends that the term suit must be limited in meaning to "a proceeding in a court of law" in order to preserve the distinction between the terms suit and claim in the 1965 and 1968 comprehensive general liability policies. Specifically, the defendant argues that the policies use the terms suit and claim differently and, because insurance policies should not be interpreted in a manner that renders any part of the policy superfluous, suit must be interpreted solely to refer to court proceedings. Although we agree with the defendant that the terms suit and claim are used differently in both the 1965 and 1968 policies, we disagree with the defendant's contention that interpreting the term suit to include a PRP letter issued by the EPA obliterates this distinction.

We previously have recognized the "canon of construction of insurance policies that a policy should not be interpreted so as to render any part of it superfluous. . . . [W]e have consistently stated that [i]f it is reasonably possible to do so, every provision of an insurance policy must be given operative effect . . . because parties ordinarily do not insert meaningless provisions in their agreements. . . . Since it must be assumed that each word contained in an insurance policy is intended to serve a purpose, every term will be given effect if that can be done by any reasonable construction . . . . A construction of an insurance policy which entirely

court proceeding preceded by a complaint would merely encourage PRPs to decline 'voluntary' involvement in site cleanups, waiting instead for an actual lawsuit to be brought in order to receive insurance coverage."); P. Majkowski, "Triggering the Liability Insurer's Duty to Defend in Environmental Proceedings: Does Potentially Responsible Party Notification Constitute a 'Suit'?" 67 St. John's L. Rev. 383, 402–403 (1993) ("[w]ith CERCLA already mired in litigation, one way to enhance its efficiency might be to remove the litigious insurers from the cleanup process"; long-term benefits might include "an incentive to polluters to modify conduct" and "the evolution of pollution liability insurance" [internal quotation marks omitted]). Thus, the effects of such an interpretation on the efficient administration of CERCLA are unclear. Accordingly, we reject the defendant's argument.

neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all of its provisions and is consistent with the general intent." (Citations omitted; internal quotation marks omitted.) *Hansen* v. *Ohio Casualty Ins. Co.*, 239 Conn. 537, 547–48, 687 A.2d 1262 (1996).

Although the 1965 and 1968 comprehensive general liability policies differ slightly, they both essentially provide that the defendant "*shall* . . . defend any *suit* against the insured" but "*may* make such investigation, negotiation and settlement of any *claim* or *suit* as it deems expedient . . . ." (Emphasis added.) Clearly, the policies distinguish between suits and claims because the defendant *must* defend any *suit* brought against the plaintiff, but reserves the *right* to investigate or settle any *suit* or *claim.* Therefore, we agree with the defendant that the terms suit and claim do not have the same meaning.

We again look to the dictionary to discern the meaning of the term claim. See *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, supra, 259 Conn. 539. A claim is "a demand for something rightfully or allegedly due" or an "assertion of one's right to something." Webster's New Twentieth Century Dictionary of the English Language, supra. Thus, a demand letter from a potential plaintiff in a personal injury action is a claim. Such a demand letter falls short of a suit, broadly defined as "an attempt to recover a right or claim through legal action"; see id.; because it has no *immediate legal effect* and therefore cannot be considered legal action. Conversely, a PRP letter *does* have immediate legal effect under CERCLA's statutory scheme. Accordingly, concluding that a PRP letter constitutes a suit does not disturb the distinction between the terms suit and claim in the 1965 and 1968 comprehensive general liability policies.

The defendant next argues that the term suit should be limited to court proceedings in order to provide insurers with a bright line rule concerning the extent of their duty to defend. An insurer's duty to defend is usually determined by the allegations contained in the complaint and the defendant argues that, because PRP letters "commonly do not contain anything even analogous to allegations that support a cause of action," insurers will be unable to measure the extent of their duty to defend. Further, the defendant contends that "a bright line rule is especially important for insurance coverage claims governed by Connecticut law, because . . . an insurer who wrongfully refuses to defend may become obligated to indemnify its insured by reason of that wrongful refusal, despite the existence of grounds on which coverage is otherwise barred." We disagree.

"It is beyond dispute that an insurer's duty to defend, being much broader in scope and application than its duty to indemnify, is determined by reference to the allegations contained in the complaint. . . . The obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts [that] bring the injury within the coverage. . . . If an allegation of the complaint falls even possibly within the coverage, then the [insurer] must defend the insured. . . . Accordingly, an insurer's duty to defend its insured is triggered without regard to the merits of its duty to indemnify." (Citations omitted; internal quotation marks omitted.) *Wentland* v. *American Equity Ins. Co.*, 267 Conn. 592, 600, 840 A.2d 1158 (2004). Moreover, "[w]here an insurer is guilty of a breach of its contract to defend, it is liable to pay to the insured not only his reasonable expenses in conducting his own defense but, in the absence of fraud or collusion, the amount of a judgment

[or settlement] obtained against the insured up to the limit of liability fixed by its policy." *Keithan* v. *Massachusetts Bonding & Ins. Co.*, 159 Conn. 128, 139, 267 A.2d 660 (1970); see also *Missionaries of the Co. of Mary, Inc.* v. *Aetna Casualty & Surety Co.*, 155 Conn. 104, 114, 230 A.2d 21 (1967).

As we have discussed previously in this opinion, a PRP letter issued by the EPA will *always* constitute a suit within the meaning of standard comprehensive general liability insurance policy language. Furthermore, the PRP letters in the present matter were sufficiently detailed for the defendant to discern whether the allegations contained within the letters fell within the scope of the plaintiff's insurance coverage. Both the Solvents Recovery Service and the Old Southington Landfill PRP letters notified the plaintiff that the EPA had "documented the release and threatened release of hazardous substances, pollutants and contaminants" at the respective hazardous waste sites. The letters further cited specific sections of CERCLA and the Resource Conservation and Recovery Act as the statutory authority for EPA action at the sites and made demand for specific sums of money as payment for past response costs incurred by the EPA. The letters also notified the plaintiff of its future liability and specifically identified the future studies and activities to be performed at the respective sites. Accordingly, the allegations contained within both the Solvents Recovery Service and the Old Southington Landfill PRP letters were analogous to allegations contained within a complaint and were sufficiently precise to enable the defendant to determine the extent of its duty to defend.

Moreover, a PRP letter issued by the EPA generally will contain sufficient information for an insurer to determine, on the face of the letter, whether the allegations contained therein trigger its duty to defend. EPA guidelines provide that a PRP letter should contain the

following components: "(a) A notification of potential liability for response costs, (b) a discussion about future notices and the possible future use of special notice procedures, (c) a general discussion about site response activities, (d) a request for information about the site (if appropriate), (e) the release of certain site-specific information (where available), (f) a discussion about the merits of forming a PRP steering committee, (g) a notice regarding the development of an administrative record, and (h) a deadline for response to the letter and information on the EPA representative to contact." Interim Guidance on Notice Letters, Negotiations, and Information Exchange, supra, 53 Fed. Reg. 5301. Accordingly, we conclude that our determination that a PRP letter constitutes a suit provides insurers with a bright line rule concerning the extent of their duty to defend and we reject the defendant's argument to the contrary.

Finally, we address the appropriate disposition of the present matter. The plaintiff argues that we must remand the case to the trial court with direction to render summary judgment in its favor. Specifically, the plaintiff argues that an insurer has a duty to defend an insured "[i]f an allegation of the complaint [or PRP letter] falls *even possibly within the coverage*"; (emphasis added) *Wentland* v. *American Equity Ins. Co.*, supra, 267 Conn. 600; and that it is entitled to summary judgment because the defendant was unable to demonstrate as a matter of law that the plaintiff's allegations fall outside the scope of its insurance coverage.[28] The

[28] "[M]ost courts hold that an insurer has a duty to defend a claim against its insured unless it can establish as a matter of law, that there is no possible factual or legal basis on which [the insurer] might eventually be obligated to indemnify [the] insured under any policy provision. . . . For example, if an exclusion may operate to relieve an insurer of its duty to indemnify and the applicability of the exclusion cannot be determined until after a trial, the insurer must defend the underlying suit. . . .

"On the other hand, there is obviously no duty to defend cases for which, as a matter of law, there is no coverage." (Citations omitted; internal quotation marks omitted.) 1 B. Ostrager & T. Newman, supra, § 5.02, p. 204.

defendant responds that we must remand the case to the trial court for further proceedings because genuine issues of material fact exist concerning whether the settlement agreement between the parties bars the plaintiff's claims. We agree with the defendant that we should remand the present matter to the trial court for further proceedings.

The following additional facts and procedural history are necessary for our resolution of this issue. In 1987, the EPA and the Connecticut department of environmental protection began investigating the plaintiff's chemical manufacturing facility in Bethel for alleged violations of CERCLA and the Resource Conservation and Recovery Act. The plaintiff sought defense and indemnification from the defendant pursuant to its comprehensive general liability insurance policies, but the defendant disputed coverage and its duty to defend. In 1989, the plaintiff and the defendant entered into a settlement agreement in which the defendant paid the plaintiff $1.3 million and the plaintiff released the defendant from any and all claims the plaintiff might have under its comprehensive general liability policies relating to or originating at the Bethel facility. Additionally, the settlement agreement automatically amended the policies to exclude such claims.

On July 7, 1998, the plaintiff moved for partial summary judgment in the present matter concerning the defendant's duty to defend in the Solvents Recovery Service and the Old Southington Landfill administrative proceedings.[29] See footnote 10 of this opinion. The defendant thereafter filed a cross motion for summary

[29] We note that, at that point, the plaintiff had not yet withdrawn its indemnity claims. In its motion for summary judgment, the plaintiff argued that it was entitled to indemnification for the losses incurred at the Solvents Recovery Service and the Old Southington Landfill sites because the defendant had breached its duty to defend. See *Keithan* v. *Massachusetts Bonding & Ins. Co.*, supra, 159 Conn. 139.

judgment, arguing, inter alia, that it had been released from any obligation to defend or indemnify the plaintiff because of the release provision and policy exclusion in the 1989 settlement agreement. The plaintiff countered that the release "was intended only to release [the defendant] from claims and liabilities directly involving the Bethel facility."

Subsequently, the trial court issued a memorandum of decision denying both the plaintiff's motion for partial summary judgment and the defendant's cross motion for summary judgment. The court determined that the 1989 settlement agreement and general release "do not lend themselves to a plain language interpretation"[30] and that facts and circumstances extrinsic to the agreement would need to be considered in order to determine the intent of the parties. Accordingly, the trial court denied the defendant's cross motion for summary judgment. Additionally, the trial court declined to read the ambiguity in the policy exclusion in favor of the plaintiff because "[w]hat [was] truly at issue . . . [was] not the scope of the policy exclusion . . . but that of the [r]elease and the [r]eleases provision of the [s]ettlement [a]greement" and, consequently, "the rule that insurance policies must be interpreted and enforced in the manner most favorable to the insured [was] not applicable to the defendant's claim of release." As a result, the trial court denied the plaintiff's motion for partial summary judgment.

We decline to address the propriety of the trial court's ruling because that issue is not before us in this appeal.

---

[30] The trial court applied New York law, which both parties agreed was the law applicable to the settlement agreement. The trial court observed that "[i]n New York, as in Connecticut, if a contract provision is reasonably susceptible of more than one interpretation, facts and circumstances parole to the agreement can be considered to determine the intention of the parties, including conversations and negotiations made prior to or contemporaneous with the contract in question and the purpose or object of the contract." (Internal quotation marks omitted.)

In addition, we reject the plaintiff's request to remand the case to the trial court with direction to render summary judgment in its favor.

The judgment is reversed and the case is remanded with direction to deny the defendant's motion for summary judgment and for further proceedings according to law.

In this opinion the other justices concurred.