This opinion is uncorrected and subject to revision before publication in the New York Reports.
-----------------------------------------------------------------

No. 129
Remet Corporation,
            Appellant,
          v.
The Estate of James R. Pyne, &c.,
et al.,
            Respondents,
et al.,
            Defendant.



            Scott A. Chesin, for appellant.
            Neil M. Gingold, for respondents.



STEIN, J.:

        On this appeal, we are asked to consider whether a

letter from the Department of Environmental Conservation (DEC)

notifying plaintiff Remet Corporation that it was a potentially

responsible party for a site's environmental contamination

required plaintiff to take action within the meaning of a

- 1 -

contractual indemnification clause.  We conclude that the particular language of the letter at issue threatened imminent adverse legal consequences and was, therefore, sufficiently coercive as to "require" action under the meaning of the indemnification clause.

I.

Decedent James R. Pyne was the founder and sole stockholder of Remet Corporation, a company that manufactures products for use in the investment casting industry.  In a Purchase and Sale Agreement entered into in March 1999, Pyne sold to Burmah Castro Holding, Inc. all of Remet's stock and facilities, along with real property that he had been leasing to Remet.  Because one of the parcels of real property abutted the Erie Canal Site in Utica, which had been listed as an Inactive Hazardous Waste Site, the sales agreement contained an indemnification provision.  In relevant part, that provision obligated Pyne to "indemnify, defend and hold [the] [b]uyer . . . harmless" for "Environmental Losses"

> "that arise out of or relate to . . . any environmental remedial, investigatory or monitoring action taken or any other Losses under or relating to any Environmental Law with respect to any of the Company's Real Properties or the Company's assets or operations (past or present), as a result of conditions which exist (or previously existed) on or prior to the Closing Date, provided that Losses under this Section . . . shall only be indemnified by Seller if such Losses arise out of or result from actions by any Indemnified Party that such Indemnified Party is required to take under or in

connection with any Environmental Law . . .
(and such Loss shall not arise out of or
result from communications by such
Indemnified Party with any Governmental
Entity [except to the extent required under
any Environmental Law])" (emphasis added).

By its terms, the indemnification obligation was to
remain in effect for 10 years and "claims for indemnification
asserted prior to the end of such period[] . . . [would] survive
until final resolution thereof."  Pyne also entered into an
Environmental Escrow Agreement pursuant to which he deposited
$2.7 million into an escrow account to fund payments arising from
his indemnification obligation for environmental losses under the
sales agreement.  Remet's current management team ultimately
acquired all of Remet's stock and the indemnification rights
under the sales agreement.

In October 2002, Remet received a letter from DEC that
is at the heart of this dispute.  Labeled **<ins>NOTICE LETTER URGENT
LEGAL MATTER - PROMPT REPLY NECESSARY</ins>**," the letter informed Remet
that DEC had documented a release of "hazardous substances" (see
42 USC §§ 9601 [14]; 9602) and the presence of "hazardous wastes"
(see ECL 27-1301) at the Erie Canal Site adjacent to Remet's real
property.  The letter further stated that "[r]esponsible parties
are liable for monies expended by the State in taking response
actions" and that DEC had determined that Remet was "a
potentially responsible party [PRP] for the site's
contamination."  In the letter, DEC requested that Remet
implement and finance a remedial program for the site, to be

memorialized in a consent order.  DEC advised that, "if a signed Consent Order [was] not received within 30 days . . ., all further discussions [would] terminate," and DEC would perform the necessary work itself and then seek recovery from Remet, as a PRP.  In that event, the PRP letter "serve[d] as a demand for payment of all monies [DEC] may expend," with interest accruing from the date of the letter.

Remet did not sign a consent order within the required time period, but began investigating DEC's claims and gave notice to Pyne that it was asserting an indemnification claim under the sales agreement.  Although Pyne did not assume defense of the claim, his attorneys contacted DEC and cooperated with Remet in undertaking investigative efforts with respect to the Erie Canal Site.  Pyne died in March 2003.  Because none of the PRPs identified by DEC agreed to undertake remediation of the site, DEC determined that it would address the site's contamination with State funds and seek recovery from the PRPs, ultimately adopting a $12.5 million decontamination plan.  Remet filed notices of claim against Pyne's estate seeking indemnification for environmental liabilities under the sales agreement, including approximately $550,000 in costs already incurred by Remet.  After the Estate objected to a release of funds from the escrow account and insisted that Remet refrain from dealing with DEC directly regarding Remet's potential liability for remediation of the site, Remet commenced this action, asserting

claims for contractual and common-law indemnification.

Following joinder of issue, Remet moved for summary judgment, seeking indemnification in the amount of $550,388.60, and a declaration that it was entitled to reimbursement for all future costs that could arise as a result of its investigation into and remediation of the site. Supreme Court, among other things, granted Remet summary judgment on liability and declared that Remet was entitled to indemnification for past and future environmental losses arising out of DEC's investigation and remediation of the Erie Canal Site. On defendant's appeal, the Appellate Division unanimously reversed, denied Remet's motion and granted summary judgment to defendants, declaring that Remet "is not entitled to indemnification from defendants" (112 AD3d 1313, 1315 [4th Dept 2013]). The court concluded that, because "DEC's letter merely informed . . . [Remet] of [its] potential liability and sought voluntary action on [its] part, . . . [the letter] did not require [Remet] to take action" (id. at 1314 [internal quotation marks and citation omitted]). We granted Remet's motion for leave to appeal (23 NY3d 907 [2014]).

II.

The plain language of the governing contractual indemnity provision, together with the language of the PRP letter and the surrounding facts and circumstances, demonstrate that Remet was entitled to indemnification because it was "required," within the meaning of the sales agreement, to act in response to

the PRP letter (see generally Drzewinski v Atlantic Scaffold & Ladder Co., 70 NY2d 774, 777 [1987]).  The PRP letter stated that it pertained to an "Urgent Legal Matter," indicated that a prompt reply was "necessary," and set forth the consequences that would flow from Remet's refusal to act.  Regardless of whether Remet was designated a potentially responsible party or a responsible party, the letter demanded either a consent order or payment, and any language indicating that Remet's response was voluntary must be read in terms of those demands.  In other words, the PRP letter -- by its terms -- effectively marked the beginning of a "legal" process against Remet pursuant to the ECL, in which DEC expressly sought recovery from Remet for any amounts expended in remediating the Erie Canal Site.[1]

        Additionally, the circumstances surrounding the execution of the indemnification clause include the parties' awareness that, because the Erie Canal Site was listed as an inactive hazardous waste site, the purchaser of the property at

_____

        [1]  Other state's courts have concluded that, given the adverse consequences -- such as large fines, use of the PRP's noncompliance against it in future litigation to apportion costs, and the potential that the administrative agency may remediate a site at a higher cost and then demand full reimbursement from the PRP -- that can flow from a failure to respond to a PRP letter, "'[i]t would be naive to characterize [a PRP] letter as a request for voluntary action.  [There is] no practical choice other than to respond actively to the [PRP] letter'" (R.T. Vanderbilt Co. v Continental Cas. Co., 273 Conn 448, 466 [2005], quoting Hazen Paper Co. v United States Fid. & Guar. Co., 407 Mass 689, 697 [1990]; see Johnson Controls v Employers Ins. of Wausau, 264 Wis2d 60, 113 [2003], cert denied 541 US 1027 [2004]).

issue here risked incurring substantial expenses, and that Pyne accordingly deposited a large sum in escrow to cover at least a portion of those potential expenses.  Pyne's attorneys began cooperating with DEC shortly after the PRP letter was received, and only ceased to do so when their negotiations proved unsuccessful -- indicating that Pyne, the actual signatory to the sales agreement, viewed the PRP letter as requiring action.

In short, the PRP letter issued to Remet was sufficiently coercive and adversarial as to "require" action "under or in connection with any Environmental Law" pursuant to the sales agreement, given that it threatened litigation and imminent adverse legal and financial consequences pursuant to the ECL (see Borg-Warner Corp. v Insurance Co. of N. Am., 174 AD2d 24, 35 [3d Dept 1992], lv denied 80 NY2d 753 [1992]; see also Carpentier v Hanover Ins. Co., 248 AD2d 579, 580 [2d Dept 1998]). Moreover, inasmuch as Remet asserted its claims within 10 years of the closing date of the sales agreement, those claims "shall survive until final resolution thereof."  Accordingly, based on the particular language of the PRP letter and the indemnification clause at issue here, Remet is entitled to contractual indemnification for past and future environmental losses incurred as a result of DEC's investigation and remediation of the Erie Canal Site, and Supreme Court properly granted summary judgment to plaintiff on liability.  Accordingly, the order of the Appellate Division should be reversed, with costs, and the

judgment of Supreme Court reinstated.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed, with costs, and judgment of Supreme Court, Oneida County, reinstated.  Opinion by Judge Stein.  Chief Judge Lippman and Judges Pigott, Rivera, Abdus-Salaam and Fahey concur.


Decided October 20, 2015