# United States Court of Appeals
## For the First Circuit

No. 12-2182

IN RE MOULTONBOROUGH HOTEL GROUP, LLC,

Debtor.

_____

ROK BUILDERS, LLC,

Appellant,

v.

2010-1 SFG VENTURE LLC,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Torruella, Thompson and Kayatta,
Circuit Judges.

William S. Gannon for appellant.
Gary D. Ticoll, with whom Paul T. Martin, Greenberg Traurig, LLP, Edmond J. Ford, and Ford & Associates, P.A., were on brief for appellee.

July 18, 2013

**KAYATTA, Circuit Judge.** This appeal presents two competing claims to the assets of the bankrupt Moultonborough Hotel Group, LLC. Appellant ROK Builders, LLC constructed a hotel for Moultonborough and has a mechanic's lien on the property. Appellee 2010-1 SFG Venture, LLC, is the assignee of the construction lender and has a mortgage on the hotel. When Moultonborough filed for bankruptcy, SFG sought a declaration that its mortgage was senior to ROK's lien to the extent the construction lender had disbursed loan funds to ROK. ROK responded by seeking a declaration that its lien was senior to SFG's mortgage and by advancing various additional counterclaims. The New Hampshire bankruptcy court and district court ruled for SFG. We now affirm.

## I. Background

This dispute has its origins in a project that began in 2006 to build a Hampton Inn & Suites in Tilton, New Hampshire. On December 1, 2006, ROK signed a contract with Moultonborough to construct the hotel. ROK began work, but the project stalled when Moultonborough proved unable to pay its bills. In April 2007, ROK terminated the contract due to nonpayment of roughly $1.6 million. ROK signaled its willingness to resume work if Moultonborough secured adequate financing and paid the balance due, with interest.

On June 26, 2007, Moultonborough signed an agreement letter with Specialty Finance Group in which Specialty committed to extending up to $8.7 million in new funding to restart the project.

-2-

ROK claims to have then immediately taken steps to resume construction. On September 21, ROK signed a new construction agreement with Moultonborough. Less than a month later, on October 10, Specialty signed a formal construction financing agreement with Moultonborough, as anticipated by the commitment letter. As security, Moultonborough executed a mortgage on the property, which Specialty recorded the next day. In conjunction with the financing agreement, Specialty paid ROK more than $1.8 million to settle the amount due, with interest, to ROK under its original 2006 construction agreement with Moultonborough.

ROK then set about finishing the hotel. For its work, it received loan disbursements from Specialty, in conjunction with at least two of which it executed lien waivers. In its final waiver, executed for the period ending May 31, 2008, ROK acknowledged past payments from Specialty of $5,751,419.39 for work done under its 2007 agreement with Moultonborough, and listed a balance due of $954,571.03. The waiver provided,

> In consideration of the payment of the above stated sums currently due and amounts previously paid, the receipt of which is hereby acknowledged, [ROK][1] hereby waives, relinquishes, and releases any and all liens, rights, claims and interests (including,

---

[1] The waiver primarily refers to ROK as the "Contractor," but in one instance refers to the company as the "Subcontractor." On appeal, neither party argues that this apparent drafting error changes the waiver's legal effect, and for the sake of clarity we have replaced references to either the "Contractor" or "Subcontractor" with "ROK."

> without limitation, all rights to mechanic's and materialmen's liens) owned, to be owned, claimed or held by [ROK] in and to the [Hampton Inn & Suites in Tilton] . . . by reason of the labor performed and/or materials furnished by [ROK] . . . prior to and including the Payment Date . . . .

At the time it submitted the waiver, ROK was unaware that Specialty had decided to stop payments due to Moultonborough's failure to secure additional financing, as its loan agreement with Specialty required. Indeed, Specialty did not inform ROK of this decision even when it received the waiver, and ROK performed further work in June, still unaware that it would not be paid. ROK's briefs do not dispute that it received an additional $682,655.01 from Specialty, presumably after the May waiver, yielding a total payout of $6,434,074.40 for work performed under the 2007 construction contract. However, ROK maintains that it is still owed $2,487,411.94 for work under that contract, secured by a mechanic's lien.[2]

Despite the unresolved payment issue, the hotel opened successfully in June of 2008. Moultonborough and Specialty,

---

[2] The record is somewhat unclear regarding the details of Specialty's additional $682,655.01 payment. It may represent at least partial satisfaction of the $954,571.03 balance due as of May 31, 2008. Yet ROK's mechanic's lien of $2,487,411.94 is the sum of: (i) the May balance, (ii) an additional $1,083,313.22 for work ROK apparently performed in June, and (iii) $449,527.69 of retainage. Because we resolve this appeal fully in SFG's favor and hold that SFG's right to reimbursement of $6,434,074.40 for mortgage funds disbursed to ROK is senior to ROK's lien, we need not address whether that lien should be reduced in light of Specialty's $682,655.01 payment.

however, soon found themselves in financial trouble.  In May of 2009, Specialty's parent company, Silverton Bank, N.A., failed, and Specialty assigned the construction mortgage on the hotel to the Federal Deposit Insurance Corporation, the receiver for Silverton.  Soon after, the FDIC assigned the mortgage to SFG.  Later in 2009, Moultonborough filed a petition in New Hampshire bankruptcy court for reorganization under chapter 11 of the bankruptcy code.

On March 15, 2011, SFG initiated an adversary proceeding against ROK in bankruptcy court, seeking a declaration that $6,434,074.40 of the construction mortgage -- the amount Specialty had disbursed to ROK for work performed under the 2007 construction contract -- was senior to ROK's mechanic's lien.  In response, ROK filed a dozen counterclaims: two seeking a determination that its lien was senior to SFG's mortgage, and an additional ten advancing causes of action sounding in tort, contract, and equity.  SFG filed a motion to dismiss, which the bankruptcy court granted as to the ten secondary counterclaims.  SFG then filed a motion for summary judgment on the competing seniority claims, which the bankruptcy court granted.  ROK timely appealed to the district court, see 28 U.S.C. § 158(a)(1), which affirmed following de novo review.  ROK Builders, LLC v. 2010-1 SFG Venture, LLC, No. 12-cv-57-PB, 2012 WL 3779669 (D.N.H. Aug. 30, 2012).  On September 28, 2012, ROK filed a timely notice of appeal to this court.

## II. Analysis

On appeal, ROK challenges the grant of summary judgment on the competing seniority claims and the dismissal of three of its secondary counterclaims -- specifically, those for breach of an implied contract, promissory estoppel, and unjust enrichment. Although we constitute the second tier of appellate review in this case arising out of a decision by the bankruptcy court in an adversary proceeding, "we cede no special deference to the determinations made by the . . . district court" and instead "assess the bankruptcy court's decision directly." City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.), 656 F.3d 82, 87 (1st Cir. 2011). In doing so, we "scrutinize that court's findings of fact for clear error, and afford de novo review to its conclusions of law." Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 107 (1st Cir. 1997).

The legal standards traditionally applicable to motions for summary judgment and motions to dismiss apply without change in bankruptcy proceedings. See Soto-Rios v. Banco Popular de P.R., 662 F.3d 112, 115 (1st Cir. 2011); Banco Santander de P.R. v. López-Stubbe (In re Colonial Mortg. Bankers Corp.), 324 F.3d 12, 15 (1st Cir. 2003). Accordingly, in reviewing the bankruptcy court's summary judgment ruling, our inquiry is whether any "genuine issue of material fact exists" and whether "the moving party is entitled

to judgment as a matter of law." Soto-Rios, 662 F.3d at 115; see also Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56. As for the court's ruling on the motion to dismiss, "we assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theory of liability," and we affirm "if the plaintiff's factual averments hold out no hope of recovery" on that theory. Banco Santander de P.R., 324 F.3d at 15; see also Fed. R. Bankr. P. 7012(b); Fed. R. Civ. P. 12(b)(6). As our analysis below makes plain, the bankruptcy court had ample bases for ruling as it did.

## A.    The Competing Seniority Claims.

We turn first to the competing seniority claims. As assignee of the mortgage, SFG advances the unremarkable position that, to the extent Specialty paid ROK for its work, and to that extent only, the mortgage is senior to any remaining mechanic's lien that ROK has. ROK counters that its lien for later work on the project for which it was not paid takes precedence over the mortgage. In support of this position, ROK asserts that because it began work on the project before the mortgage was recorded, any lien arising out of work on the project performed at any time, whether prior to or after recording of the mortgage, remains senior to the mortgage, even to the extent the mortgagee paid for work.

For the following reasons, we find that New Hampshire law plainly rejects ROK's position.[3]

First, the New Hampshire statutory scheme that recognizes mechanics' liens, provides the procedure for their perfection, and specifies their relative priority over other encumbrances, runs directly against ROK's position. The New Hampshire recording statute, N.H. Rev. Stat. Ann. § 477:3-a, acknowledges by negative implication the rule that the first party to record without notice of a prior party's claim has priority. It provides that any "instrument which affects title to any interest in real estate" must be recorded and "shall not be effective as against bona fide purchasers for value until so recorded." Id. In Amoskeag Bank v. Chagnon, 572 A.2d 1153, 1155 (N.H. 1990), the New Hampshire Supreme Court quoted section 477:3-a, as well as N.H. Rev. Stat. Ann. § 477:7, which provides that conveyances of real estate are not valid against anyone but the grantor and his heirs unless recorded, and then explained:

> New Hampshire is a "race-notice" jurisdiction. That is, a purchaser or creditor has the senior claim if he or she records without

---

[3] In this dispute between the builder of a hotel in New Hampshire and the holder of a mortgage on that hotel, the bankruptcy and district courts both understandably assumed that New Hampshire law supplied the substantive rules of decision, with no objection by any party. No party argues on appeal that a different choice of law should be made, or that such a choice would make a difference. Therefore, we, too, rely on New Hampshire's substantive law. See Jasty v. Med. Tech., Inc., 528 F.3d 28, 34 n.5 (1st Cir. 2008).

> notice of a prior unrecorded interest. The purpose then of the recording statutes recited above is to provide notice to the public of a conveyance of or encumbrance on real estate. The statutes serve to protect both those who already have interests in land and those who would like to acquire such interests.

In a subsequent decision, the Supreme Court also linked the race-notice rule to section 477:3-a. See Mansur v. Muskopf, 977 A.2d 1041, 1046 (N.H. 2009). Specifically, the Court cited Amoskeag Bank for the proposition that the state is a race-notice jurisdiction. Id. It then explained that "[t]herefore, a purchaser with a senior claim in real estate must record such interest in order to prevail over a bona fide purchaser for value," and cited "[i]n particular" section 477:3-a. Id.

Here, the race-notice rules favor SFG, because the mortgage was recorded well before the work for which a lien is claimed was performed. This fact alone does not defeat ROK's claim, however, because the statutory scheme in New Hampshire creates an exception to the race-notice rule for mechanics' liens. Specifically, a mechanic's lien "shall have precedence and priority over any construction mortgage." N.H. Rev. Stat. Ann. § 447:12-a; see also Lewis v. Shawmut Bank, 650 A.2d 744, 745 (N.H. 1994) (describing section 447:12-a as "[a]n exception to the general rule" of race-notice). This exception is, however, itself subject to an important qualification: a mechanic's lien "shall not be entitled to precedence as provided in this section to the extent

that the mortgagee shows that the proceeds of the mortgage loan were disbursed . . . toward payment of invoices from or claims due subcontractors and suppliers of materials or labor for the work on the mortgaged premises." § 447:12-a. As the bankruptcy court concluded, this qualification takes the § 447:12-a exception out of play in this case. Because ROK does not contest the fact that Specialty, the original mortgagee, made $6,434,074.40 in such payments to ROK, the plain text of § 447:12-a demonstrates that the exception for which the statute provides has no application to the facts before us.

In response to this conclusion, ROK contends that the scheme envisioned by § 447:12-a is nonexclusive, and that an alternative source of priority for mechanics' liens can be found in older New Hampshire case law. But in support of that proposition, ROK points only to two nineteenth-century cases, neither of which establishes any principle at variance with the present statutory scheme. See Cheshire Provident Inst. v. Stone, 52 N.H. 365 (1872); Graton & Knight Mfg. Co. v. Woodworth-Mason Co., 38 A. 790 (N.H. 1897). In neither case did the mortgagee pay the mechanic for any work. Rather, the mortgagee, presumably for some consideration extended to the owner, acquired a mortgage after work on the property subject to the mortgage had already commenced. Graton & Knight Mfg. Co., 38 A. at 790; Cheshire Provident Inst., 52 N.H. at 365. The mortgage thus remained junior to the mechanic's lien for

-10-

whatever unpaid work arose out of the ongoing project. In the language of the statute, the lien in full "continue[d]." N.H. Rev. Stat. Ann. § 447:9.

In this case, by contrast, payment was in fact "previously made" to ROK by Specialty. Therefore, the lien for that paid work expired, leaving ROK with only a lien for later work. See N.H. Rev. Stat. Ann. §§ 447:2, 447:9. And Specialty, unlike the mortgagees in Graton & Knight and Cheshire Provident, even obtained a written lien waiver, to boot. See Graton & Knight Mfg. Co., 38 A. at 790; Cheshire Provident Inst., 52 N.H. at 365.

Accordingly, we conclude that the bankruptcy court did not err in concluding that section 447:12-a establishes the seniority of SFG's mortgage over ROK's mechanic's lien to the extent of the $6,434,074.40 that Specialty disbursed to ROK.

**B.   ROK's Counterclaims.**

We turn now to ROK's counterclaims for breach of an implied contract, promissory estoppel, and unjust enrichment. All three claims rest on Specialty's course of dealings with ROK as the hotel neared completion, roughly two years before SFG appeared on the scene. In essence, ROK maintains that Specialty, eager to have the value of a finished rather than unfinished hotel as collateral for its loan, misled ROK into believing that it would be paid for completing construction. ROK now demands that SFG, as the assignee of Specialty's mortgage, make good on that alleged commitment.

-11-

### 1. Assumption of liability for implied contract and promissory estoppel.

Taking the first two counterclaims together, ROK asserts that although the doctrines of implied contract and promissory estoppel are distinct, the same conduct by Specialty entitles it to recover under either theory. An implied contract is an enforceable agreement that arises from "the conduct of the parties, apart from oral and written words." Durgin v. Pillsbury Lake Water Dist., 903 A.2d 1003, 1006 (N.H. 2006). Promissory estoppel, in contrast, provides a basis for recovery when no contract exists; if a promisor should reasonably expect a promisee to rely on a promise, and the promisee in fact does so, courts may enforce the promise to avoid injustice. See Great Lakes Aircraft Co. v. City of Claremont, 608 A.2d 840, 853 (N.H. 1992); Panto v. Moore Bus. Forms, Inc., 547 A.2d 260, 266 (N.H. 1988); see also Restatement (Second) of Contracts § 90 (1981).

As the bankruptcy court recognized, however, even assuming that Specialty's actions created an implied contract between Specialty and ROK or entitled ROK to recover from Specialty under a theory of promissory estoppel, there is no basis for holding SFG liable for the actions of Specialty. No language in the assignments purports to transfer such liabilities to SFG. ROK is therefore left to contend that SFG "implicitly assumed" Specialty's liability to ROK when SFG accepted assignment of the mortgage and loan agreement between Specialty and Moultonborough

-12-

without expressly rejecting any assumption of Specialty's liabilities. In support of this contention, ROK relies on section 328 of the Restatement (Second) of Contracts (1981).

With certain exceptions, section 328 treats a general assignment of all rights under a contract as a delegation of unperformed duties under the same contract, enforceable against the assignee by the obligor of the assigned rights. Without commenting on whether and to what extent section 328 might in some cases apply to assignments of mortgages and defaulted notes, we can easily reject any assertion that section 328 helps ROK in this case. The contract assigned to SFG was an agreement or agreements between Moultonborough as borrower/mortgagor and Specialty as lender/mortgagee. If SFG assumed any obligations as a result of that assignment, they would have been the obligations of the lender/mortgagee under those agreements. The alleged liability that ROK seeks to impose on SFG, however, arises from an alleged implied contract (or promise) between Specialty and ROK. SFG received no assignment of any rights under any contract such as that. In short, even if we were to assume that obligations under a contract follow rights upon assignment absent indication otherwise, nothing in section 328 would suggest that obligations under one contract follow rights under another. For this simple reason, ROK's argument does not get to first base.

### 2. Unjust enrichment.

ROK's claim of unjust enrichment fails, too, although for a reason other than that relied on by the bankruptcy court. "Unjust enrichment is an equitable remedy" that entitles a party to restitution from one who has "receive[d] 'a benefit which would be unconscionable for him to retain.'" Clapp v. Goffstown Sch. Dist., 977 A.2d 1021, 1024-25 (N.H. 2009) (quoting Kowalski v. Cedars of Portsmouth Condo. Assoc., 769 A.2d 344, 347 (N.H. 2001)). The bankruptcy court dismissed ROK's claim for unjust enrichment on the basis that SFG could not be liable for the conduct of Specialty -- the same basis on which it dismissed ROK's implied contract and promissory estoppel claims. New Hampshire law is clear, however, that restitution may be required even if the party receiving the benefit has not itself engaged in wrongful acts. Gen. Insulation Co. v. Eckman Constr., 992 A.2d 613, 621 (N.H. 2010). Passive acceptance of a benefit can be enough, as long as it would be unconscionable for the recipient to retain the benefit. See id.

Having convinced us that SFG's lack of involvement in the alleged wrongdoing by Specialty is not itself grounds to dismiss ROK's claim for unjust enrichment against SFG, ROK nevertheless fails to point to any allegation that would support a finding that SFG received a benefit, the retention of which would be unconscionable. ROK relies on the case of Nute v. Blaisdell, 374

-14-

A.2d 923 (N.H. 1977).  That case, however, serves simply to show by contrast what was lacking in ROK's allegations in this case.

In Nute, George Blaisdell acted as a fiduciary for June McKeage.  374 A.2d at 924.  Blaisdell caused McKeage to borrow funds, which Blaisdell then used to buy a house, which he placed in his mother's name.  Id.  There was no evidence that the mother, who knew McKeage, paid anything for the home.  Id. at 924-25.  The New Hampshire Supreme Court held that those facts could support a finding that the mother had been unjustly enriched.  Id. at 925.  After all, she got a house for nothing when it was clear that the person whose money and credit paid for the house intended no gift.  Here, SFG simply bought a mortgage on a completed hotel, from a failed bank through the FDIC.  ROK alleges no facts plausibly demonstrating that the purchase transaction was not negotiated at arm's length.  Nor does ROK allege any fact suggesting that SFG would have paid the same amount for a mortgage on an uncompleted hotel.  Therefore, even assuming that Specialty received a benefit from the unpaid work, it is certainly not unconscionable for SFG to retain that which it bought.  See Axenics, Inc. v. Turner Const. Co., 62 A.2d 754, 766-67 (N.H. 2013).

Accordingly, although our analysis differs from that of the bankruptcy court, the court did not err in dismissing ROK's unjust enrichment claim.

Affirmed.