# United States Court of Appeals
## For the First Circuit

No. 15-2189

IN RE: OAK KNOLL ASSOCIATES, L.P.,

Debtor

ROBERT HARRIS,

Appellant,

v.

ROSA SCARCELLI and OAK KNOLL ASSOCIATES, L.P.,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Barron, Circuit Judges.

James F. Molleur, with whom Molleur Law Office was on brief, for appellant.
Daniel L. Cummings, with whom Norman, Hanson & DeTroy, LLC was on brief, for appellee Rosa Scarcelli.

August 19, 2016

**HOWARD**, <u>**Chief Judge**</u>.  Appellant Robert Harris seeks to recover a real estate broker's commission that he claims is owed to him by Appellees Rosa Scarcelli and Oak Knoll Associates, L.P. (collectively, "Oak Knoll").  Concluding on these facts that Oak Knoll is not contractually obligated to pay Harris a commission and that Harris has failed to identify a basis upon which he would be entitled to equitable relief, we affirm the grant of summary judgment in favor of Oak Knoll.

## I.    <u>Background</u>

Oak Knoll Associates, L.P., is a limited partnership whose general partners at all relevant times consisted of Pamela Gleichman and Rosa Scarcelli.  This case began when the partnership sought to sell some apartment buildings that it owned in Norwalk, Connecticut.  To that end, Oak Knoll enlisted the services of Robert Harris, a real estate broker.

The parties accordingly entered into an agreement dated May 16, 2011 ("the listing agreement").  The listing agreement was to remain in effect for six months and outlined two scenarios under which Oak Knoll would be obligated to pay Harris a commission for his services.[1]  First, Harris could earn a commission if the property were to be sold during the six-month term of the listing

---

[1] We reproduce the actual text of the listing agreement below, where we also discuss the parties' dueling interpretations thereof.  For present purposes, we provide only a general summary of the listing agreement.

agreement.  Second, Harris could earn a commission if an offer to purchase or lease the property were to be accepted during the six-month term or within six months of the termination of the listing agreement (and if the accepted offer in fact resulted in a sale). The listing agreement also provided that if negotiations continued after the six-month term, the listing agreement would be automatically renewed until the conclusion of those negotiations. A rider to the listing agreement, in turn, provided that Harris's commission for selling the property would be 4.8 percent.

Harris subsequently located a potential buyer, Navarino Capital Management, LLC ("Navarino").  On October 11, 2011, Navarino and Oak Knoll executed a purchase and sale agreement ("2011 P&S"), whereby Navarino agreed to purchase the property from Oak Knoll for $6,300,000.  The deal gave Navarino 45 days to inspect the property and allowed Navarino to terminate the deal for a number of reasons not relevant for present purposes.

In November 2011, Navarino requested and received the first in a series of extensions to the inspection period. Navarino had discovered that the property was subject to a number of restrictive covenants that Oak Knoll had agreed to at the behest of the Connecticut Housing Finance Authority when Oak Knoll first purchased the property in 1988.  On February 24, 2012, Navarino wrote to Oak Knoll, offering to purchase the property at a reduced price in light of those covenants.

Oak Knoll did not accept this revised offer. Instead, intra-partnership disputes spilled into federal court: on February 28, 2012, Scarcelli sued Gleichman in United States District Court for the District of Maine. Scarcelli obtained a default judgment against Gleichman and the district court in turn issued a permanent injunction in Scarcelli's favor. See Scarcelli v. Gleichman, No. 2:12-CV-72-GZS, 2012 WL 1965681 (D. Me. May 31, 2012). Among other things, the injunction forbade Gleichman from entering into a contract to sell the property without Scarcelli's prior written consent. See id. at *4.

Harris, in turn, was kept apprised of these developments. On June 25, 2012, Scarcelli's attorney emailed Harris to inform him that Scarcelli would seek contempt sanctions against Gleichman or any third party who -- knowing of the district court's injunction -- acted in violation of that injunction. The record is silent as to what transpired over the following months, save for the fact that on November 13, 2012, Harris sent an invoice to Gleichman demanding payment for his services, and some months after that recorded a lien against the property for a broker's commission.

The story picks up again on March 18, 2013, when the partnership filed for Chapter 11 bankruptcy in United States Bankruptcy Court for the District of Maine. Within days, Navarino demanded the return of his escrow deposit from Oak Knoll. On April

- 4 -

1, 2013, the partnership filed an application to retain Harris as a real estate broker, and on June 18, 2013, Harris filed a proof of claim for his brokerage services.[2]

Although the retention application had not yet been approved, on August 21, 2013, the partnership's counsel sent Harris an email telling Harris to "get us a contract for the $6,275,000." That same day, Harris informed Navarino that Oak Knoll was amenable to selling the property for that amount.

Then, on August 28, 2013, Scarcelli filed an objection to the application to retain Harris. The bankruptcy court held a hearing on the application on September 4, 2013. At the conclusion thereof, the court granted the application, provided that Oak Knoll file a revised proposed order reflecting certain changes. However, such a proposed order was never filed and the bankruptcy court thus never approved the retention application. In October 2013, the partnership's counsel withdrew the still-pending retention application with the court's approval. That same month, Navarino and Oak Knoll Associates executed a new purchase and sale agreement. This second agreement eventually resulted in the successful sale of Oak Knoll's apartment buildings.

But although Navarino got the property and Oak Knoll got its money, Harris received nothing for his efforts. Oak Knoll

---

[2] Oak Knoll and Scarcelli each eventually filed objections to the proof of claim.

never paid him. Unsurprisingly, Harris pursued claims against both the partnership and Scarcelli in federal bankruptcy court, seeking the commission that he believed he was owed. Eventually, Oak Knoll moved for summary judgment, arguing that there was no material dispute of fact and that Harris was -- as a matter of law -- not owed a commission. Following oral argument, the bankruptcy court granted the motion and denied Harris's claims.

The bankruptcy court's decision, in turn, was appealed to United States District Court for the District of Maine, which affirmed the grant of summary of judgment. This appeal timely followed.

## II.  **Standard of Review**

"[T]he legal standards traditionally applicable to motions for summary judgment apply [] without change in bankruptcy proceedings." Daniels v. Agin, 736 F.3d 70, 78 (1st Cir. 2013). Thus, summary judgment is proper "if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Soto-Rios v. Banco Popular de P.R., 662 F.3d 112, 115 (1st Cir. 2011). The evidence, of course, must be viewed in the light most favorable to the nonmoving party (in this case Harris) and all reasonable inferences must be taken in that party's favor. See In re Varrasso, 37 F.3d 760, 763 (1st Cir. 1994).

We review, in turn, a bankruptcy court's grant of summary judgment de novo.  See Soto-Rios, 662 F.3d at 115.[3]  And although the bankruptcy court's decision was first reviewed by the district court, we review the bankruptcy court's decision as if on a clean slate.  See id.

### III. Discussion

In seeking to recover his unpaid commission, Harris invokes two provisions of the Bankruptcy Code.[4]  First, he cites 11 U.S.C. § 501, arguing that he is owed a commission under the terms of his contract with Oak Knoll.  Second, Harris argues that he is entitled to it as a form of equitable relief under 11 U.S.C. § 105(a).  We consider each theory of recovery in turn, explaining why each one fails as a matter of law in light of the undisputed facts of this case.

---

[3] There may be some tension within our cases as to whether we defer to a bankruptcy court's findings of fact when reviewing its grant of summary judgment.  Compare In re Moultonborough Hotel Group, LLC, 726 F.3d 1, 4 (1st Cir. 2013) (reviewing questions of law de novo and findings of fact for clear error) with Stoehr v. Mohammed, 244 F.3d 206, 207-08 (1st Cir. 2001) (per curiam) (applying de novo review to questions of law and to findings of fact).  It is, however, presently unnecessary to reconcile these cases, as Harris's claims fail under either standard of review.

[4] Harris also sought payment pursuant to 11 U.S.C. § 503. However, he abandoned this theory of recovery on appeal and we therefore do not consider it.

## A.    __Proof of Claim__

Harris filed a proof of claim for his unpaid commission pursuant to 11 U.S.C. § 501.   The Bankruptcy Code, in turn, provides that when, as here, a party objects to such a claim, the bankruptcy court is to hold a hearing, and must thereafter allow the claim unless (in addition to other exceptions not presently relevant) the claim "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured. . . ."  Id. § 502(b)(1).  The ultimate validity of such a claim is determined with reference to state law.  See Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000) ("The 'basic federal rule' in bankruptcy is that state law governs the substance of claims . . . .").  Here, the parties agree that we must look to Connecticut law to determine whether Harris is entitled to his commission.

In  Connecticut,  a  broker's  right  "to  recover  a commission depends upon the terms of [his] employment contract with the seller."  Revere Real Estate, Inc. v. Cerato, 438 A.2d 1202, 1204 (Conn. 1982).  Thus, while a broker can earn a commission merely by procuring a ready, willing, and able buyer, see Menard v. Coronet Motel, Inc., 207 A.2d 378, 379 (Conn. 1965), the parties can "make the broker's right to a commission dependent on specific conditions, such as the consummation of the transaction

- 8 -

and full performance of the sales contract."  Revere Real Estate,

438 A.2d at 1205.

With this in mind, we turn to the listing agreement,

which provides, in relevant part, as follows[5]:

> In order protect AGENT should the property known as Oak
> Knoll Apartments . . . (the "PROPERTY") is sold within
> six (6) months from the date hereof, to sell the property
> for $7,000,000.00 or any such price as the OWNER may
> subsequently agree upon, agree to pay AGENT the
> commission set forth below.  All parties to this
> agreement also agree that all communications and
> agreements, whether written oral, will be transmitted
> through AGENT.
>
> OWNER agrees that if the property is sold during the
> term of this Agreement to a Purchaser, procured by Agent
> during the term of this Agreement as outlined above,
> OWNER will pay AGENT a commission per Schedule A
> attached.  Should negotiations continue after the six
> (6) month period the OWNER agree to automatically extend
> this agreement and its terms until such as the
> negotiations are completed.
>
> The commission shall be due and payable by certified
> check in full upon the closing of title (or lease
> execution). If, during the term hereof, or within six
> (6) months from the termination of this Agreement,
> should there be an acceptance of an offer to
> purchase/lease from the PURCHASER, OWNER agrees to pay
> the AGENT a commission as per this AGREEMENT.
>
> This Agreement shall become effective immediately and
> shall remain in effect six (6) months from the date
> hereof.

Harris zeroes in on two provisions of the listing agreement.

First, he points out that it obligates Oak Knoll to pay him "should

_____

[5] With the exception of the property's address, we have
otherwise reproduced the relevant portion of the listing agreement
verbatim, with its warts and all.

- 9 -

there be acceptance of an offer," and asserts that he was owed a commission when an offer to purchase the apartments was accepted back in October 2011. Second, he asserts that the listing agreement's automatic extension provision (i.e., in the event of continued negotiations) kept the listing agreement alive such that he earned a commission based on the eventual sale of the property to Navarino. We examine his arguments seriatim, explaining why neither is persuasive.

## 1.   Acceptance of an Offer

As stated, the listing agreement obligates Oak Knoll to pay Harris a commission "should there be acceptance of an offer" during the term of the listing agreement or within six months of its termination. The parties don't appear to dispute that there was acceptance of an offer to purchase the property in October 2011, within the effective term of the listing agreement. Harris accordingly argues that he was owed a commission as of that date, because (in his telling) the listing agreement requires Oak Knoll to pay him upon the mere acceptance of an offer, regardless of whether this results in a sale. Oak Knoll counters that the listing agreement requires that a sale actually occur in order for Harris to earn his commission. Thus, succinctly put, our task is to interpret the contract (using Connecticut law) to determine whether Oak Knoll's obligation to pay Harris is predicated on the

sale of the property.  See In re Advanced Cellular Sys's., Inc., 483 F.3d 7, 13-14 (1st Cir. 2007).

Although the listing agreement is hardly an exemplar of draftsmanship, we nonetheless think it unambiguous.  See Salce v. Wolczek, 104 A.3d 694, 698 (Conn. 2014) ("If the contract is unambiguous, its interpretation and application is a question of law for the court, permitting the court to resolve a breach of contract claim on summary judgment if there is no genuine dispute of material fact."); see also Ramirez v. Health Net of the Ne., Inc., 938 A.2d 576, 587 (Conn. 2008) ("A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself.").[6]  That is, the language of the contract leaves no doubt that the parties intended that a sale take place in order for Harris to earn his commission.

We acknowledge, of course, that in Connecticut, a court has "no right to add a new term to a contract."  Williams v. Lilley, 34 A. 765, 768 (Conn. 1895).  We have not done so here. While the acceptance-of-an-offer provision does not explicitly

---

[6] Indeed, other courts -- when interpreting contracts under Connecticut law -- have found that typographical errors and the like do not necessarily render those contracts ambiguous.  See, e.g., United Aluminum Corp. v. Boc Grp., Inc., No. 08-CV-977 (JCH), 2009 WL 2589486, at *6-7, *7 n.5 (D. Conn. Aug. 21, 2009) (finding contract unambiguous despite the presence of "typographical error[s]" or mistakes produced by "inattentive drafting").  And so too here.  The many such errors in the listing agreement may produce frustration on the part of the reader, but they do not produce ambiguity so as to stave off summary judgment.

- 11 -

state that an accepted offer must result in a sale, the text of the listing agreement nevertheless indicates that this is precisely what must happen if Harris is to earn his commission. For starters, the acceptance-of-an-offer provision is qualified by important language: that Oak Knoll "agrees to pay the AGENT a commission as per this AGREEMENT." The last four words dictate that we read this provision consistent with the contract as a whole. And indeed, the sale requirement is unambiguously reflected in the contract. Cf. Ramirez, 938 A.2d at 587 (explaining that courts should not "import terms into [an] agreement . . . that are not reflected in the contract" (emphasis added)).

For example, the listing agreement is titled a "Non-Exclusive Agency Sale Agreement." Cf. Bialowans v. Minor, 550 A.2d 637, 639-40 (Conn. 1988) (holding, in the context of interpreting contract language, that a section heading delimited the scope of language appearing under said heading). Similarly, the first sentence of the quoted portion of the listing agreement provides:

> In order protect AGENT should the property known as Oak Knoll Apartments . . . (the "PROPERTY") is sold within six (6) months from the date hereof, to sell the property for $7,000,000.00 or any such price as the OWNER may subsequently agree upon, agree to pay AGENT the commission set forth below.

The drafting errors do not obscure the critical point: this sentence announces the general purpose of the listing agreement

(viz., protecting the agent in the event that the property "is sold") and concomitantly sets forth Oak Knoll's duty to pay Harris a commission.  A commonsense reading would suggest that Oak Knoll's obligation to pay Harris is connected to the overall purpose of the listing agreement.  Cf. Dist. of Columbia v. Heller, 554 U.S. 570, 577 (2008) ("Logic demands that there be a link between the stated purpose and the command.").  And by thus linking the protection of Harris's interests, the sale of the property, and Oak Knoll's obligation to pay Harris a commission, the listing agreement indicates that a sale must take place in order for Harris to earn his commission.

Other features of the listing agreement support this conclusion.  The second-quoted paragraph of the listing agreement conditions payment of Harris's commission on the property being "sold" during the term of the listing agreement.  The third-quoted paragraph of the listing agreement provides that the commission "shall be due and payable . . . upon closing of title."  Similarly, Schedule A states (under the heading of "Sale Commissions") that "[t]he commission for selling the property shall be [] 4.8%."[7]  All told, these repeated references to the sale of the property confirm

---

[7] As the listing agreement expressly referenced Schedule A, and the parties were undoubtedly aware of that document's terms, we may properly consider it as having been incorporated into the listing agreement.  See, e.g., Allstate Life Ins. Co. v. BFA Ltd. P'ship, 948 A.2d 318, 324 (Conn. 2008).

that the parties intended to make Harris's commission contingent on the sale of the property.

Finally (and critically), reading the listing agreement as not requiring a sale (as Harris would have us do) would render the first and second-quoted paragraphs of the listing agreement superfluous, thereby contravening well-settled Connecticut law. See Ramirez, 938 A.2d at 586 ("The law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous." (internal citations omitted)). That is, Harris maintains that the listing agreement obligates Oak Knoll to pay him if an offer is accepted, regardless of whether a sale ultimately occurs. The listing agreement, however, is crystal-clear that Oak Knoll must pay Harris a commission if the property "is sold." It is axiomatic that a sale is preceded by acceptance of an offer; as Harris concedes, the former necessarily entails the latter. Cf. Norfolk & W. Ry. Co. v. Sims, 191 U.S. 441, 447 (1903). Consequently, if acceptance of an offer were all that were needed for Harris to earn his commission, there would have been no need to specify (as the listing agreement repeatedly does) that he could do so upon the successful closing of a sale. Thus, we do not believe that the listing agreement is susceptible to two reasonable interpretations and that Oak Knoll merely offers a better reading than Harris. Cf. Cruz v. Visual Perceptions, LLC, 84 A.3d 828, 835 (Conn. 2014) ("If the language of the contract is

- 14 -

susceptible to more than one reasonable interpretation, the contract is ambiguous."). Rather, we believe that Harris's interpretation of the listing agreement is untenable, failing to "give operative effect to every provision in order to reach a reasonable overall result." R.T. Vanderbilt Co., Inc. v. Cont'l Cas. Co., 870 A.2d 1048, 1059 (Conn. 2005).[8]

The lily having been sufficiently gilded, the important point is this: the listing agreement unambiguously requires that a sale take place in order for Harris to earn his commission.[9] The

---

[8] Harris tries to flip this point on its head, arguing that the foregoing interpretation of the listing agreement renders the acceptance-of-an-offer provision superfluous. His argument is without merit. The acceptance-of-an-offer provision as we have construed it expands Harris's contractual rights in two respects:

First, it requires Oak Knoll to pay a commission if an offer were to be accepted within the term of the listing agreement and resulted in a sale, but the sale only closed after the listing agreement's expiration, and no negotiations took place so as to keep the listing agreement alive until the closing. In such a case, Harris would not be entitled to a commission but for the acceptance-of-an-offer provision.

Second, this provision enables Harris to claim a commission if an offer were to be accepted (again, resulting in a sale) within six months of the listing agreement's expiration and in the absence of continued negotiations. And once more, in such a scenario, Harris's only route to a commission would be through the acceptance-of-an-offer provision.

Thus, our interpretation of the listing agreement does not render the acceptance-of-an-offer provision superfluous.

[9] Accordingly, it does not matter whether Navarino was a ready, willing, and able buyer, as Oak Knoll was not obligated to pay Harris unless a sale actually happened. Harris similarly argues that the bankruptcy court erred in finding that Oak Knoll was not responsible for the failure of the 2011 P&S. However, our conclusion that the listing agreement requires a sale may make it

- 15 -

bankruptcy court thus correctly determined that Harris was not entitled to his commission based on the acceptance of an offer in 2011.

## 2. Continued Negotiations

Oak Knoll and Harris also agreed that the listing agreement would be automatically renewed in the event of continued negotiations. Harris maintains that such negotiations took place and thereby kept the listing agreement alive, such that he earned a commission based on the ultimate sale of the property. We disagree.

We begin by considering the language of the contract. The listing agreement states, in relevant part: "Should negotiations continue after the six (6) month period the OWNER agree to automatically extend this agreement and its terms until such as the negotiations are completed." Harris takes this to mean that the listing agreement would not expire so long as

_____

unnecessary to reach this point. Cf. Revere Real Estate, 438 A.2d at 1205 ("A seller cannot defeat a broker's right to its commission by his unilateral nonperformance of a sales contract unless the listing contract reserves the right to condition payment upon consummation of the sales contract." (emphasis added)). Regardless, we need not address this argument because it is waived: Harris fails to bring to our attention any authority indicating that Oak Knoll's supposed breach of the 2011 P&S has any bearing on our analysis. See United States v. Munyenyezi, 781 F.3d 532, 542 n.11 (1st Cir. 2015). In fact, he offers no explanation whatsoever as to why this point should even affect the bottom-line conclusion. A claim of error without explanation as to the error's import generally amounts to little more than sound and fury. Which is to say, it signifies nothing.

negotiations took place at least once every six months.[10]  Harris claims, in turn, that he would be entitled to a commission if an offer were to be accepted within twelve months of the last instance of negotiations.[11]

Even assuming for the sake of argument that this is a reasonable interpretation of the contract, see Cruz, 84 A.3d at 835, Oak Knoll is nonetheless entitled to summary judgment as there is no evidence that an offer was accepted within twelve months of the last instance of negotiations.  Despite taking all reasonable inferences in Harris's favor, the record contains no evidence of any negotiations occurring between June 2012 and March 2013.  In fact, it is wholly silent on that point.  Thus, under Harris's proffered interpretation of the listing agreement, the negotiations concluded at some point in June 2012 (i.e., as no negotiations took place within six months of that date), and the listing agreement expired in December 2012.  There is, in turn, no evidence that an offer was accepted within twelve months of June 2012.  Thus, even under Harris's proposed interpretation of the

---

[10] In other words, negotiations would be deemed to "continue" unless there were a six-month gap in those negotiations.

[11] That is, seizing on the words "and its terms," Harris points out that one of the "terms" of the listing agreement is that it is to remain in effect for six months.  And moreover, the acceptance-of-an-offer provision entitles Harris to a commission if an offer were to be accepted within six months of the listing agreement's expiration (although, as we have established, the offer would have to result in a sale).

contract, he cannot show that continued negotiations kept the listing agreement alive such that he earned a commission.

In attempting to show otherwise, Harris points to an exchange of emails in late March 2013. He also highlights an April 2, 2013 affidavit from Gleichman, in which she states that Harris "recently" emailed her to say that "we have a deal for $6.0 period." And Harris further points out that he contacted Navarino in August 2013. But again (and by Harris's own logic), the negotiations rang down the curtain and joined the choir invisible in June 2012, taking the listing agreement with them six months later. And while the negotiations were eventually rekindled at some point in 2013, Harris makes no argument that the already-expired listing agreement could be similarly resuscitated. The evidence cited by Harris is of no help to him.

Similarly, the evidence cited by Harris in no way suggests that the parties were continuously negotiating within the relevant timeframe: it does nothing to address the substantial gap in the record. Accordingly, Harris hasn't pointed to "hard evidence of a material factual dispute," and thus fails to stave off summary judgment. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990); see also id. ("Evidence which is 'merely colorable or is not significantly probative' will not preclude summary

judgment." (quoting <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986)).[12]

## B.    <u>Equitable Relief</u>

This leaves us with Harris's claim for equitable relief. Congress has given bankruptcy courts the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  We have cautioned, however, that this does not give bankruptcy courts "a roving writ, much less a free hand" to provide equitable relief.  <u>In re Jamo</u>, 283 F.3d 392, 403 (1st Cir. 2002). Rather, this statute "may be invoked only if, and to the extent that, the equitable remedy dispensed by the court is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code."  <u>Id.</u>  As the foregoing demonstrates, Harris was not owed a commission based on the terms of his contract with Oak Knoll; if he has an identifiable right, it must accordingly have its genesis elsewhere.

To that end, Harris points to a Connecticut statute which entitles a real estate broker to recover a commission "if it would be inequitable to deny such recovery."  Conn. Gen. Stat. § 20-

_____

[12] Harris also relies on the bankruptcy court's statement that "viewing the facts most favorably for Harris, [the negotiations] stopped by March 2013."  But as stated, there is no record evidence of negotiations taking place between June 2012 and March 2013. And neither Harris nor the bankruptcy court points to anything that would suggest otherwise.

325a(d).  However, we need not address the merits of this argument as it is doubly waived.  First, having failed to present this theory below, Harris may not do so for the first time on appeal.  His argument is kneecapped: unpreserved claims don't warrant our review.  See In re Woodman, 379 F.3d 1, 2 (1st Cir. 2004) (refusing to review a party's argument in light of its "failure to advance [it] before the bankruptcy court in the first instance").  Second, the argument is insufficiently fleshed-out to merit our consideration.  That is, the statute cited by Harris allows for equitable relief only when a broker has "substantially complied" with the statute's formalities.  See Conn. Gen. Stat. § 20-325a(d); see also Location Realty, Inc. v. Colaccino, 949 A.2d 1189, 1203 (Conn. 2008) (substantial compliance with § 20-325a is the "sole avenue to recovery that the [Connecticut] legislature chose to provide in circumstances wherein the strict construction of § 20-325a would lead to unfair results or unjust enrichment").  Harris, however, makes no effort to argue that he so complied.  As such, this argument is waived.  See Alicea v. Machete Music, 744 F.3d 773, 780 (1st Cir. 2014).  Since Harris otherwise fails to identify a right which would entitle him to equitable relief,[13] we reject this claim as well.

---

[13] In his reply brief, Harris fleetingly mentions his broker's lien and 11 U.S.C. § 506 in conjunction with his equitable relief claim.  But we need not consider the merits of this undeveloped argument for another reason altogether.  "Contentions not advanced

## IV. Conclusion

Some may find this result unfair, particularly insofar as the partnership filed an application to retain Harris's services and asked Harris to communicate with Navarino (knowing that the retention application had not yet been approved), only to withdraw the pending application after Harris did so. And some may be especially troubled by Oak Knoll's conduct given the bankruptcy court's conclusion that the partnership was in a position to make "a 100% payment to all creditors, with money left over to pay out to [the partnership's] insiders." We are not, however, asked to decide whether Oak Knoll is deserving of opprobrium, but whether Oak Knoll was entitled to summary judgment. And for the reasons stated, we hold that it was.

**AFFIRMED**.

---

in an appellant's opening brief are deemed waived." DeCaro v. Hasbro, Inc., 580 F.3d 55, 64 (1st Cir. 2009). And so it is here.